(No. 16555.—Reversed and remanded.)
THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* JOHN PARKS, Plaintiff in Error.

*Opinion filed April 23, 1926.*

1. CRIMINAL LAW—*when a defendant cannot raise question of variance between judgment and sentence for prior offense introduced in evidence.* A defendant charged with a second violation of the Prohibition act cannot object to the introduction in evidence of the record of his former conviction on the ground that there is a variance between the judgment and sentence, where such variance was due to a change in the sentence made at his own request by a *nunc pro tunc* order after the second indictment was found.

2. SAME—*to impeach a witness, record of conviction of an infamous crime must be shown.* To impeach a witness by showing his former conviction of an infamous crime the record of such conviction, or a certified copy thereof, must be shown, and the record of conviction must be of such a crime, only, as the statute has declared to be infamous, the conviction of any other offense being inadmissible for such purpose.

3. SAME—*what exhibits should not be taken to jury room.* In a prosecution for violation of the Prohibition act it is error to permit the jury to take with them to the jury room the bottle of liquor alleged to have been sold by the defendant and on which police officers had placed a label containing memoranda of its contents and from and by whom purchased; nor should the jury be permitted to take the record of the defendant's former conviction of an infamous crime, introduced for the purpose of impeachment, and the record of conviction of another offense, which had been withdrawn from the evidence.

4. SAME—*effect of introducing former conviction to impeach a witness—instruction.* The record of an infamous crime introduced in evidence for the purpose of impeaching a witness may be considered by the jury, with all the other evidence, in passing upon the credibility of the witness, but such record is not evidence of impeachment of the witness, and it is error to so modify an instruction as to give the jury the impression that they should regard the witness as absolutely impeached by such evidence.

WRIT OF ERROR to the Circuit Court of Macon county; the Hon. JAMES S. BALDWIN, Judge, presiding.

FRED HAMILTON, for plaintiff in error.

OSCAR E. CARLSTROM, Attorney General, CHARLES F. EVANS, State's Attorney, GEORGE C. DIXON, and A. R. IVENS, for the People.

Mr. JUSTICE DUNCAN delivered the opinion of the court:

Plaintiff in error, John Parks, was indicted in the circuit court of Macon county for the unlawful and felonious sale of intoxicating liquor for beverage purposes without a permit. It was also charged in the indictment that prior to the unlawful sale aforesaid the plaintiff in error had been formerly charged and convicted on a plea of guilty for unlawfully selling intoxicating liquor in said county and that a judgment and sentence had been entered against him in the circuit court of said county for such former offense. The jury found the plaintiff in error guilty as charged in this indictment, and the court, after overruling motions for a new trial and in arrest of judgment, entered judgment on the verdict and sentenced him to the penitentiary for an indeterminate term. Plaintiff in error has sued out this writ of error to review the record.

Dwight H. Trueblood and C. C. Adeylott, two police officers, testified for the People in substance as follows: On the night of July 8, 1924, they drove out to the plaintiff in

error's store, on East Eldorado street, Decatur, in two separate cars, Adeylott and two others, named Hook and Swift, traveling in one car, and Trueblood, with James Graham and two girls, in the other car. Before arriving at Parks' store the two cars were stopped and Adeylott got out of the car that he was in and searched Trueblood to ascertain if he had a bottle or container of any kind that would carry liquor and found nothing of the kind on him. Trueblood and his party then drove to a point about forty or fifty feet west of Parks' store and he got out and went into the store. He stated that he bought a package of cigarettes while plaintiff in error was standing in the store door talking to another man. Parks then said that it was time to close the store, and closed the door and locked it and came out of the store with his little girl and started west. When Parks got even with the car where Trueblood and his party were, he called back and asked Trueblood what he wanted to drink. Trueblood told him what he wanted and asked him how much it would be, and Parks said two dollars. He then gave Parks a five-dollar bill, and Parks told him to come back to the store. They went back to the store, and Parks told him to stay in the store "while I get it." Trueblood and the little girl stayed in the store while Parks crossed the street and came back in about ten minutes. Trueblood further stated that Parks went behind the counter in the store and handed him a bottle and three dollars; that then he went out and got into Graham's car and met Adeylott at the first street west of the store and gave Adeylott the bottle, and that he had no other bottle that evening and that he made no change in the contents of the bottle. On cross-examination Trueblood stated that it was about nine o'clock when they got to the store; that he did not remember who the two girls were that were with him and Graham and that he was not with any other girls that week, but that he knew the two girls pretty well.

321—10

Adeylott stated in his testimony that after he searched Trueblood to see if he had a container of any kind for liquor he stationed himself directly across the street from Parks' place, where he could see into the store. The store was lighted up and there were a couple of parties in there. When Parks and Trueblood came out of the store Trueblood was just ahead of the little girl as Parks closed the door. Parks and Trueblood walked west forty or fifty or sixty feet and stopped a bit and then turned around and came back to the store. He could see Trueblood and the little girl in there. Parks then went to the third or fourth house on the south side of Eldorado street and came back to the store about fifteen minutes later. Parks then went to the cash register and opened it, and Adeylott saw him hand across the counter the bottle and something that looked like bills, and Trueblood then put the bottle in his inside pocket while witness was looking through the window. He then went west and stopped Trueblood and his party and searched him in the presence of "the other fellows, took the bottle off of him, put a mark on the label and took charge of it." He later delivered it to one Thornell at police headquarters. Thornell pulled the cork and "they smelled it," then made another label for identification and put it on the bottle and sealed the cork with sealing wax. On being asked to describe the "smell" of the contents of the bottle he replied "mule," and over the objections of the defendant he stated that the contents of the bottle was "mule." He further stated that he was acquainted with the Parks children and with Parks and that the girl was about ten years old. He described his position from which he was looking into Parks' store as directly across the street from the store, and stated that he could see without hindrance what took place in the store, and could also see Trueblood's car, which was on a street just west of the store. Parks' store is described as being on the north side of East Eldorado street, and Adeylott's position would necessarily be across the street, just

south of the store. Adeylott further stated that he made the arrangement with Trueblood for the trip out to Parks' store, and that he (the witness) went out there for the purpose of seeing "that the buy was made and every effort was made," and that he went out with "that purpose in mind."

Neither of the two girls were used by the People as witnesses and their names were not stated at the trial, nor was Swift, who rode with Adeylott and Hook to and from Parks' place, examined as a witness.

James A. Graham testified that he went with Trueblood and the two ladies and that they drove to a point west of Parks' store, on the same side of the street the store is on. Trueblood got out and went to the store and returned in about five to eight minutes. He knew John Parks but did not see him that evening as he remembers. When Trueblood came back the witness did not notice that he had anything in particular. He did not remember of seeing Adeylott come up to the car and get something from Trueblood. He did not know whether or not Trueblood went into Parks' store, and further stated that Parks did not come down to the car he was in and have a conversation with Trueblood, and again states that he did not see Parks.

G. E. Hook testified for the People that he went to Parks' store with Swift and Adeylott and a Mr. Moore. He saw Trueblood in another automobile with Graham and two ladies, and that before they got to Parks' place Adeylott went over to the car of Trueblood but did not see what he did. He saw Trueblood's car stopped west of Parks' store, at Illinois and East avenue. He later saw Trueblood standing in the door of Parks' store, which was lighted up, but did not see anybody except Trueblood. He afterwards saw Adeylott stop Trueblood's car and Adeylott got out of his car. He knew Adeylott got a bottle but did not know whether he got it from Trueblood and did not know what he did with the bottle.

A chemist by the name of Taylor testified that he made an analysis of the contents of a bottle introduced in evidence as an exhibit and which was sealed with wax, and found that it contained 43.4 per cent of grain alcohol and that the liquid was fit for use as a beverage. He sealed the bottle after he made the analysis and identified the exhibit or bottle of liquor in evidence as the one that he had analyzed the contents of and sealed. This bottle of liquor introduced in evidence was identified by another police officer as the bottle of liquor delivered to him by Adeylott, and stated that it was in the same condition as when delivered to him by Adeylott. This bottle contained a label with the following written on it: "Department of Police, Decatur, Illinois. Liquor violation July 8, 1924. Violator Stormy Parks. Address 1421 E. Eld. Officers bought by witnesses Dwight Trueblood, witness Adeylott and Hook Custodian. Sealed by officer in charge Thornell. Case No. . .." This exhibit was introduced in evidence over the objections of the plaintiff in error.

The record of the former conviction averred in the indictment was then introduced in evidence over the objections of the plaintiff in error, the objection being that there was a variance in the judgment and sentence of the court in this: that the judgment and sentence had been changed from ninety days to sixty days. The objection was properly overruled, as the record shows that plaintiff in error by his attorney filed a petition in the circuit court after the present indictment had been found, asking that the record be changed by a *nunc pro tunc* order by changing the sentence from ninety days to sixty days in jail, and that the record was so changed by the order of the court. That record was proved to be in all respects as set forth and charged in this indictment, and that the change or variation only occurred at the instance and on the petition of the plaintiff in error after the finding of this indictment. The record as changed contained a proper judgment and sentence of

the character averred in the indictment. The proof showéd that the averments in the indictment were true in every particular as alleged, and that the alleged variance was a mere modification at the instance of Parks after this indictment was found, and such modification had no such effect as to exclude the judgment as proper evidence.

Plaintiff in error's evidence consisted of his own testimony and that of three other witnesses. He testified that he worked for his father in the grocery store; that he was at the place of business on the night in question but did not see Trueblood that evening. He was not acquainted with Trueblood. He closed the store on the evening in question at about five minutes to ten o'clock, and at the time he closed the store Pearl Coffman and F. E. Harter were in the store and had been there from eight o'clock until it was closed. He positively denied that he sold any intoxicating liquor to Trueblood or anyone else on that day or evening. He also testified that his wife came into the store just before he closed and said to him that it was time to close. He further testified that his daughter was not there with him that evening and did not go out of the store with him at the time he closed; that he went home with his wife, and that he and his wife and Harter and Coffman all went out of the store together. He did not see any automobile out in front or to the west of his store and did not hear it. Coffman and Harter both testified corroborating Parks' evidence in every particular. Harter testified that he remembered the night by reason of the newspapers giving an account of Parks' arrest on that particular night. Coffman undertook to give the reasons why he remembered the night, but was prevented from doing so by objections of the State's counsel.

One William Morris testified that he boarded at Parks' house and was there on the night of July 8,—the night in question,—and that somewhere near eight o'clock Parks'

children went to bed and that he did not see them any more that evening. On cross-examination, over the objections of the defendant's counsel, the witness stated that he was arrested there that same night, and that he stayed in the "holdover" all night of the nights of July 9 and 10, and that afterwards he stayed down at Vandalia, meaning that he stayed at what is known as the State penal farm. The defendant's motion to exclude all of the above irrelevant and improper matters concerning his arrest and imprisonment, etc., were overruled by the court on the ground that they were proper matters for the purpose of impeachment of the witness.

The People also introduced in rebuttal the record of an indictment and judgment of conviction of the defendant, Parks, of the crime of grand larceny, by which judgment and conviction he was sent to the penitentiary. The record of the conviction of the defendant of some other minor offense, not an infamous crime, was offered by the People but was later withdrawn. It appears also that the jury was allowed to take with them to their jury room the book or record of the convictions of both of said crimes, and also Exhibit 1, or the bottle of liquor aforesaid, sealed and labeled as aforesaid.

The evidence in this record is in hopeless conflict, and it was important to the defendant that the record should be free from prejudicial error. The court asked the State's attorney, in the presence of the jury, when he was cross-examining the defendant's witness Morris, whether or not he was questioning Morris about his being detained in the "holdover" and being detained at the State farm at Vandalia, if he was asking those questions for the purposes of impeachment of the witness, and on being informed that that was the purpose of the questions he overruled the defendant's objections and later refused to exclude the evidence. It is the law that the record of the former conviction of a witness or a party to the suit, if he testifies, of

an infamous crime may be introduced for the purpose of affecting his credibility as a witness, but it is the unvarying rule that the proof of the conviction of such crime must be proved by the record or a certified copy of the record of such conviction. It clearly appears that the witness Morris had not been convicted of a crime denominated by paragraph 587 of our Criminal Code as an infamous crime, and therefore the record of such conviction, or any evidence of such conviction or imprisonment, is not admissible for the purpose of discrediting the witness. (*Bartholomew* v. *People,* 104 Ill. 601.) It was also error to permit the jury to take with them the bottle of liquor in question, on which the officers had placed a label and the written statements thereon aforesaid; and it was also error to allow the jury to take the record with them containing the record of convictions of the defendant, Parks, of grand larceny and of the other crime of which he was convicted, and which latter record had been withdrawn.

The court also erred in the giving to the jury an instruction in this language:

"Circumstantial evidence is that which relates to a series of other facts than the fact in issue, which by experience have been found so associated with that fact that in relation of cause and effect they lead to a satisfactory conclusion. * * * Direct evidence is that which proves the fact in dispute directly without any inference or presumption and which, if itself is true, conclusively establishes the fact. * * * Indirect evidence is that which tends to establish the fact in dispute by proving another, and which, though true, does not of itself conclusively establish the fact, but which affords an inference or presumption of its existence."

The above instruction contains simply abstract propositions of law and the instruction should not have been given for that reason. These abstract provisions of law are stated in a manner very prejudicial to the defendant, and

could not have any other effect except to mislead the jury. This case is not one depending on circumstantial or indirect evidence but is to be decided upon the positive evidence of the witnesses in the case, and the instructions should be applicable to the facts testified to and state correct propositions of law as applied to the facts.

The defendant offered the following instruction:

"The court instructs the jury that the judgment of the court introduced in evidence in this case showing that the defendant was found guilty in this court of a felony and was sentenced to the penitentiary is not any evidence of guilt in this case and should not be considered by the jury in this case as proving or tending to prove the guilt of the defendant, in the case we are now trying."

The court added with pen and ink to the above instruction these words: "But you are further instructed that such records were introduced in evidence and were so received upon the theory of attempting to impeach the credibility of the witness Parks and for no other purpose."

The record of an infamous crime is offered against the testimony of a witness who has been convicted of such crime for the sole purpose of affecting the credibility of the witness, and the jury are allowed to take into consideration the fact of such conviction in passing upon his testimony. Such record is not evidence of impeachment of the witness, and it may not have the effect with the jury of discrediting the testimony of the defendant. The record is simply proof of a fact that the jury may take into consideration, along with the other evidence in the case, in passing upon the credibility of the witness, whether the witness be a defendant or other witness. The court by its modification of the instruction simply stated in plain words that the records were introduced and received upon the theory of attempting to impeach the credibility of the witness Parks, without any further or other explanation. The jury no doubt regarded it as a fact that both Parks and the witness Morris should

be regarded as absolutely impeached, and that the court so considered it. It referred to "records,"—not to the record,—and thereby included the other record of conviction of Parks that had been excluded or withdrawn by the State.

For the foregoing reasons the judgment of the court is reversed and the cause is remanded.

*Reversed and remanded.*